**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 4, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

SAVANT HOMES, INC.,

    Plaintiff - Appellant,

v.

DOUGLAS W. COLLINS; DOUGLAS
CONSULTING, LLC, d/b/a Collins
Custom Builders; STEWART KING, d/b/a
Kodiak Custom Design; TAMMIE
WAGNER; RON WAGNER,

    Defendants - Appellees.

No. 15-1115

———————————————————

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:13-CV-02049-WJM-MEH)**
———————————————————

Alan F. Blakley (Tyler R. Rauert, with him on the briefs), Blakley Justice, LLC,
Longmont, Colorado, appearing for Appellant.

Jacob W. Paul, Coan Payton & Payne, LLC, Greeley, Colorado, appearing for Appellees
Douglas W. Collins and Douglas Consulting, LLC.

Thomas P. Howard (William C. Groh, III, with him on the brief), Thomas P. Howard,
LLC, Louisville, Colorado, appearing for Appellees Ron and Tammie Wagner.

Stewart King, pro se, Windsor, Colorado, filed a brief.
———————————————————

Before **HOLMES**, **BALDOCK**, and **MATHESON**, Circuit Judges.
———————————————————

**MATHESON**, Circuit Judge.

_____

Plaintiff Savant Home, Inc. ("Savant") is a custom home designer and builder.  It holds a registered copyright to a floor plan of a three-bedroom ranch house ("Anders Plan").  Savant built a model house embodying that plan in Windsor, Colorado ("Savant house").  In June 2009, Ron and Tammie Wagner toured the Savant house and hired builder Douglas Collins and his firm, Douglas Consulting, LLC (jointly, "Collins") to build a house.  Collins, in turn, contracted with Stewart King to design the house.  After Collins and Mr. King completed the Wagners' house, Ms. Wagner hired them to build a second house.

Savant sued all of the foregoing parties for copyright infringement, contributory copyright infringement, civil conspiracy, trade dress infringement, and other claims.  It alleged that Defendants copied the Anders Plan by building the two houses ("accused houses").  The district court granted Defendants summary judgment, and Savant appeals.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A.  *Factual History*

The Anders Plan, embodied by the Savant house, is a ranch house with two bedrooms on one side and a master suite on the other, separated by a combined family room, dining room, and kitchen.  Savant has built and sold six Anders Plan houses.

On June 6, 2009, the Wagners hired Collins to build a house at 300 Madera Way, Windsor, CO, in anticipation of their move from Arizona to Colorado.  That same month, the Wagners traveled to Colorado and toured the Savant house, where they obtained a

brochure of the Anders Plan. The Wagners returned to the Savant house that August with Collins and Mr. King, the designer Collins had hired.

Collins completed construction of the 300 Madera Way house in 2010. The Wagners subsequently separated, after which Ms. Wagner hired Collins to build another house at 8466 Blackwood Drive, Windsor, CO. The houses at 300 Madera Way and 8466 Blackwood Drive are both ranch houses with two bedrooms on one side and a master suite on the other, separated by a combined family room, dining room, and kitchen. We discuss additional facts as necessary below.

## B.   *Procedural History*

Savant sued the Wagners, Collins, and Mr. King, alleging copyright infringement, contributory copyright infringement, civil conspiracy, trade dress infringement, intentional interference with business advantage, civil theft, and deceptive trade practices.

The Wagners and Collins moved for summary judgment, offering an expert report by architect Rob Fisher.[1] Mr. Fisher stated that numerous aspects of the Anders Plan were standard among three bedroom ranch houses, addressing functional concerns or market demand. He provided four example floor plans from a third-party online plan service company, monsterhouseplans, which included similar layouts.

In response, Savant offered an expert report by architect Justin Larson. Mr. Larson opined that the accused houses and the Anders Plan exhibited "shocking

---

[1] Mr. Fisher submitted a report, an amended report, and a rebuttal report. This opinion refers to his amended report.

similarities," indicating that Defendants "very likely" intended to "replicate the Anders Plan." Aplt. App. at 404-05. He did not identify specific or overall aspects of the Anders Plan that were a product of architectural creativity, nor did he respond to Mr. Fisher's analysis indicating that the Anders Plan consisted of standard content. On the contrary, Mr. Larson acknowledged that "[m]any homes in this neighborhood, and many others, likely share very similar programs." *Id.* at 404.

The district court granted Defendants summary judgment on every claim.[2] Savant appeals the grant of summary judgment only as to the claims of copyright infringement, contributory copyright infringement, civil conspiracy, and trade dress infringement.

On the copyright infringement claim, the district court decided Savant had failed to carry its summary judgment burden. More specifically, the court concluded Savant had not shown that the Anders Plan included any protectable content. The court ruled this failure precluded a finding of substantial similarity—an essential element of copyright infringement.[3] The court also concluded the contributory copyright infringement and civil conspiracy claims failed because they were dependent on the copyright infringement claim. Finally, the court granted summary judgment on the trade

---

[2] Mr. King, acting pro se, did not move for summary judgment. The district court nevertheless granted him summary judgment sua sponte, finding that the grounds on which Collins and the Wagners were entitled to summary judgment applied equally to him.

[3] The court alternatively concluded that, even if the one element of the Anders Plan that Mr. Fisher identified as potentially protectable were protectable, no jury could find substantial similarity based on this element.

- 4 -

dress infringement claim because Savant offered insufficient evidence of (1) inherent distinctiveness or secondary meaning and (2) a likelihood of confusion. We affirm.

## II. **DISCUSSION**

### A. *Standard of Review and Summary Judgment Standard*

We review a grant of summary judgment de novo. *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (quotations omitted); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker*, 709 F.3d at 1022 (quotations omitted); *see Anderson*, 477 U.S. at 248.

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A movant who does not bear the burden of persuasion at trial may satisfy this burden "by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim." *Id.* (citing *Celotex*, 477 U.S. at 325).

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Id.* (quotations omitted) (citing, among others, *Celotex*, 477 U.S. at 324). To satisfy this burden, the nonmovant must identify facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* (citation omitted). These facts "must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001); *see also Celotex*, 477 U.S. at 323 (explaining a movant is entitled to summary judgment when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof").

Finally, "[a]lthough our review of the record is de novo, we conduct that review from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008) (quotations omitted). Like the district court, we have "discretion to go beyond the referenced portions" of the evidence but are "not required to do so." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998).

### B. *Copyright Infringement Claim*

We affirm the grant of summary judgment on Savant's copyright infringement claim. First, as the district court concluded, Savant failed to show the Anders Plan included any protectable elements or arrangement of elements. Second, Savant's contentions that the district court erred lack merit.

- 6 -

1. **Legal Background**

A plaintiff must prove two elements to establish copyright infringement: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see Blehm v. Jacobs*, 702 F.3d 1193, 1199 (10th Cir. 2012). The parties do not dispute that Savant owns a valid copyright in the Anders Plan.

The copying element consists of two components. First, a plaintiff must show a defendant copied the plaintiff's work "as a factual matter." *Blehm*, 702 F.3d at 1199 (quotations omitted). Second, a plaintiff must demonstrate "substantial similarity between the allegedly infringing work and the elements of the copyrighted work that are legally protected." *Id.* (quotations omitted). This second component "determines whether a defendant's factual copying constitutes infringement." *Id.* Defendants do not dispute that Savant demonstrated factual copying. Accordingly, only substantial similarity is at issue.

To decide the substantial similarity issue, a court must determine (1) which elements of the copyrighted work are protectable, and (2) whether these elements are substantially similar to the accused work. *Blehm*, 702 F.3d at 1200. A court may address either step first. *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 833 (10th Cir. 1993).

a. *Protectable Elements*

We begin with the general requirements of protectability and then address protectable elements of architectural works.

i.   Protectability

The substantial similarity analysis requires us to "distill the protectable elements of the copyrighted work—i.e., determine what aspects constitute protectable expression." *Blehm*, 702 F.3d at 1200.

Section 102(a) of the Copyright Act protects "original works of authorship." 17 U.S.C. § 102(a). Originality exists where a "work was independently created by the author (as opposed to copied from other works), and . . . it possesses at least some minimal degree of creativity." *Feist*, 499 U.S. at 345. The required level of creativity is "extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Id.* (quotations omitted). This originality requirement separates protectable from unprotectable elements of a copyrighted work. *See id.* at 348 ("[C]opyright protection may extend only to those components of a work that are original to the author.").

Section 102(b) provides that in "no case does copyright protection for an original work of authorship extend to any idea . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work." Taking § 102(a) and § 102(b) together, courts describe the distinction between originality and non-originality as the difference between expression and an idea. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985) ("The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality."); *Blehm*, 702 F.3d at 1200 (explaining that § 102(b) "enshrines the fundamental tenet that

copyright protection extends only to the author's original expression and not to the ideas embodied in that expression" (quotations omitted)).

The distinction between expression and ideas can be "difficult to apply in practice," *Blehm*, 702 F.3d at 1201 (quotations omitted), as the "test for infringement of a copyright is of necessity vague," *id.* (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960)). We therefore follow a "case-by-case approach," which may "'inevitably be ad hoc,'" *id.* (quoting *Peter Pan Fabrics*, 274 F.2d at 489), mindful of the "primary objective of copyright," which is "not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts,'" *Feist*, 499 U.S. at 349 (quoting U.S. Const. art. I, § 8, cl. 8). *See Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1285 (10th Cir. 1996) ("[I]n differentiating between an idea and a specific form of expression, it is important to remember that copyright law seeks to achieve a proper balance between competition based on public ideas and incentive to produce original work.").

### ii. Architectural Works

The Copyright Act expressly protects "architectural works," 17 U.S.C. § 102(a)(8), which it defines as follows:

> An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

*Id.* § 101.

- 9 -

Thus, individual standard elements of architectural works are not protected, but original selections or arrangements of such elements may be protectable. *See Blehm*, 702 F.3d at 1201-02 ("[T]he combination of common architectural elements and use of specific designs may constitute original expression that is protected."); *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 103-04 (2d Cir. 2014) (explaining that the protectable elements of an architectural work include "original elements—or original arrangements of elements"); *Intervest Const., Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914, 919 (11th Cir. 2008) ("[W]hile individual standard features and architectural elements classifiable as ideas or concepts are not themselves copyrightable, an architect's original combination or arrangement of such elements may be."); *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1296 (D.C. Cir. 2002) ("[P]rotectible expression may arise through the ways in which artists combine even unprotectible elements. For example, while color is not protectible, the manner in which an artist selects, coordinates, and arranges color may be." (quotations and alterations omitted).

b. *Substantial Similarity of Accused Works to Protected Elements of Copyrighted Works*

In addition to identifying which elements of a work are protected, a court must determine "whether the protected elements are substantially similar to the accused work." *Blehm*, 702 F.3d at 1202. Substantial similarity exists when "the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's [protectable] expression by taking material of substance and value." *Id.* (quotations omitted); *see also Country Kids*, 77

- 10 -

F.3d at 1288 ("The essence of this test is whether the 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.'" (quoting *Peter Pan Fabrics*, 274 F.2d at 489)); *Gates Rubber*, 9 F.3d at 833 ("[T]he court must find that the defendant copied protectable elements of the plaintiff's program and that those protectable elements comprise a substantial part of the plaintiff's program when it is considered as a whole."). A court may grant summary judgment for a defendant only "if the protectable expression in the copyrighted work and the allegedly infringing work is so dissimilar . . . that no reasonable jury could find for the plaintiff on the question of substantial similarity." *Blehm*, 702 F.3d at 1202-03 (quotations omitted).

## 2. **District Court's Ruling**

The district court granted Defendants summary judgment on the copyright infringement claim and presented its three-part analysis in the following order.

First, it concluded that Savant failed to show that any elements of the Anders Plan were protectable based on evidence in the record. It reasoned that, although Savant asserted in its opposition to summary judgment that nine elements of the Anders Plan are original,[4] Savant failed to conduct "any analysis of how these elements were designed, or

---

[4] Savant's statements of facts in its opposition memorandums asserted:

The original or unique elements of the Anders Plan includes, but is not limited to: (1) the open floor plan with the master bedroom on one side of the house with 2 bedrooms on the opposite side, (2) the plan's flex space, (3) the inviting entry into the open space, (4) the large stairway to the basement with the large entry that allows natural light onto the stairs and

Continued . . .

- 11 -

explain how they are original or unique to the Anders Plan." *Savant Homes, Inc. v. Collins*, No. 13-CV-2049-WJM-MEH, 2015 WL 899302, at *4 (D. Colo. Feb. 27, 2015). The court noted Mr. Larson's report only opined on similarities between the accused houses and the Anders Plan and failed to address which elements were protected or why. It concluded Savant's briefing and evidence were insufficient to meet its summary judgment burden.

Second, the district court noted that, in contrast to Savant's expert report, Defendants' expert report did analyze individual elements of the Anders Plan. The court said Mr. Fisher's report indicated every element of the Anders Plan was unprotectable, with the possible exception of one element that "might be protectable": the "wrought iron bars over the 3 center windows at the front of the garage." Aplt. App. at 257.

The district court concluded that Savant failed to dispute Mr. Fisher's report. It assumed the iron bars element was protectable, but concluded Defendants were still entitled to summary judgment. It determined that no reasonable jury could find substantial similarity based on this element because the garage windows on the accused houses had no iron bars.

---

the great room beyond, (5) the large master suite and master bath creating a retreat including the fireplace at the foot of the tub and visible from the bed on the opposite side of the wall, (6) the oversized walk-in closet, (7) direct access to the laundry room from the master suite, (8) proximity of the laundry room to the garage to allow garage access from the master suite, and (9) side load garage with immediate access to the kitchen.

Aplt. App. at 276, 302-03.

Third, putting aside Savant's failure to analyze the protectability of any of the nine elements, the district court examined each element and concluded Defendants were still entitled to summary judgment. Applying the abstraction-filtration-comparison ("AFC") test—one method for analyzing substantial similarity—the court filtered out the unprotectable elements and then concluded that no reasonable juror could find substantial similarity based on the remaining elements.[5]

3. **Analysis**

We affirm the district court's grant of summary judgment on Savant's copyright infringement claim. First, we agree that Savant failed to carry its summary judgment burden. Second, Savant's contentions that the district court erred are unpersuasive.

a. *Savant Failed to Carry Its Summary Judgment Burden*

Savant failed to show that the Anders Plan included any protectable element or arrangement of elements. We arrive at this conclusion by analyzing the parties' arguments and evidence within the burden-shifting framework for summary judgment. *See Celotex*, 477 U.S. at 321-328.

i. Defendants' Motions for Summary Judgment

In their motions for summary judgment, Defendants submitted Mr. Fisher's report and argued the Anders Plan included no protectable element, except possibly one. Mr.

---

[5] We note that the court's analysis in step three was in tension with its initial conclusion that Savant failed to show that any element or arrangement of elements was protectable. As we explain in our analysis below, we agree with the court's initial conclusion.

Fisher's report stated the Anders Plan consisted almost exclusively of standard elements arranged in a standard fashion. We highlight a few examples from the report:

1. The "overall layout, with the master suite located on one side, common areas (kitchen, dining, family rooms) in the middle, and kids/guest bedrooms on the other side is a standard layout used to provide more privacy to the master suite." Aplt. App. at 252. Such a layout is a response to market demand for a "spacious master suite," *id.*, and is common because it allows for "efficient and functional adjacencies to take place, such as locating the laundry next to the master," *id.* at 254.[6]

2. The "open floorplan consisting of the kitchen, dining room, and family room" and the "adjacency of kitchen, dining, and family rooms to one another" are "a common feature of houses today." *Id.* at 253. Architects frequently include these features due to market demand for a more "capacious feel," "family togetherness," and "visibility of children by adults in the kitchen," *id.* at 253, as well as "less formal[ity]" and the ability to "entertain larger numbers of guests," *id.* at 254.[7]

3. The "incorporation of a master walk-in closet" is standard because "most new homes probably would not sell" without them. *Id.* at 253. "Present-day owners have much more clothing than owners from decades ago, and a larger variety of clothes for everything from work-out clothes to formal wear. To fit all of the clothes storage needs of present-day owners, walk-in closets are the norm." *Id.* at 254.

4. The "location of the laundry room next to the master closet and the mudroom is also a widespread design feature" based on functional considerations and market demand. *Id.* at 253. Specifically, it "allows the laundry center to be next to where the majority of dirty clothes are generated (the master closet and the outside in the case of kids and gardening adults)." *Id.* Moreover, "[p]resent-day homeowners want the laundry on the same floor as the bedrooms instead of in the basement." *Id.* at 256.

---

[6] The report included floor plans of four example houses from an online plan service company, all of which include this same element.

[7] Three out of the four example houses he provided included this same feature.

5. The "side load garage with immediate access to the kitchen" is "common" because it "improve[s] the curb appeal by keeping the garage doors off of the front facade." *Id.* at 252. It is also common because it "provides the benefit of not having to back out into the street when exiting the garage. The drive turn is large enough to allow cars to be backed and turned in the drive prior to exiting onto the street." *Id.* at 254.

In sum, Mr. Fisher's report showed the Anders Plan consisted of standard elements and standard arrangements of elements. Because standard content receives no copyright protection, *see* 17 U.S.C. § 101, this showing satisfied Defendants' "initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact" as to the unprotectability of this content in the Anders Plan. *Adler*, 144 F.3d at 670-71 (citing *Celotex*, 477 U.S. at 323).

Mr. Fisher's report included one exception to his general conclusion that all the elements and arrangements of elements in the Anders Plan are standard. It briefly stated the iron bars over the three center windows at the front of the garage were "original[]" and therefore "might be protectable." Aplt. App. at 257. As to this one element, Defendants offered evidence that the garage windows of the accused houses were distinct and far from substantially similar with the Anders Plan element in that they lacked any metal bars.

ii. Savant's Response

In its response motions, Savant identified nine elements and asserted they were "original or unique." *See supra* note 4. In support, it cited (1) an interrogatory response it submitted to the Wagners and (2) the deposition testimony of Alan Strope, the

president of Savant. Both sources recited that various elements were unique, original, or distinct, but neither provided any facts or analysis supporting these assertions.

Savant then argued there were "triable disputes over the substantial similarity between the protectable elements of the Anders Plan and the Accused Houses." Aplt. App. at 286, 312. But it failed to argue which aspects of the Anders Plan were protectable or cite any supporting evidence.

Savant cited Mr. Larson's report, but that report opines only that the accused houses and the Anders Plan are similar; it provides no facts or analysis supporting the protectability of any element or arrangement of elements. On the contrary, Mr. Larson's report even supports Defendants' assertion that the Anders Plan consists of standard arrangements of individual elements, which copyright law does not protect. In discussing the overall layout of the Anders Plan, Mr. Larson said that "[m]any homes in [the Blackwood Drive] neighborhood, and many others, likely share very similar programs for their main floor (3 car garage, master bedroom and supporting bathroom and walk in closet, two other bedrooms that may share a bathroom, a kitchen, a mudroom, a laundry room, and a great room)." Aplt. App. at 404. Later, he reiterated his opinion about the common nature of this layout, stating, "many homes in Colorado likely share nearly exactly the same programmatic requirements for the first floor." *Id.* at 405.

Finally, Savant did not even acknowledge Mr. Fisher's suggestion that the iron bars on the garage windows might be protectable and therefore did not dispute Defendants' evidence indicating the garage windows of the accused houses lacked any such bars.

* * * *

We therefore agree with the district court's conclusion that Savant failed to carry its burden on summary judgment. Savant offered no evidence indicating (1) any individual element or (2) any arrangement of elements was protectable. As to the one element Mr. Fisher identified as potentially protectable—the iron bars on the garage windows of the Anders Plan—Savant failed to dispute Defendants' evidence that the garage windows of the accused houses were entirely distinct, as they lacked any iron bars.[8] As to the arrangement of elements, Mr. Larson's report supported rather than disputed Defendants' evidence indicating that the overall layout of the rooms was standard in Colorado. Savant therefore failed to offer any basis for a finding of substantial similarity. Because substantial similarity is an essential element of copyright infringement, Defendants were entitled to summary judgment. *See Bausman*, 252 F.3d at 1115 ("To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case.").

For these reasons, we affirm the district court's grant of summary judgment as to Savant's copyright claim.

---

[8] The district court concluded the garage windows of the accused houses were entirely distinct because (1) each accused house had only one garage window and (2) there were no iron bars on these windows. The record provides adequate support only for the second fact. Based on this fact alone, we agree with the district court's conclusion that the garage windows of the accused houses were distinct from those of the Anders Plan.

- 17 -

b.  *Savant's Arguments*

We additionally affirm because Savant's contentions that the district court erred are not persuasive.  First, Savant argues the district court erroneously analyzed substantial similarity by applying the AFC test.  Second, it contends the court improperly treated the parties' expert reports, adopting a legal conclusion in Mr. Fisher's report and excluding Mr. Larson's report entirely.

i.  The District Court's Application of the AFC Test

Savant argues the district court should not have applied the AFC test because that test is categorically inapplicable to architectural works.  The AFC test derives its name from its three steps.  At the abstraction step, "we separate the ideas (and basic utilitarian functions), which are not protectable, from the particular expression of the work." *Country Kids*, 77 F.3d at 1284-85. [9]  Next, "we filter out the nonprotectable components

---

[9] This step originates from the abstraction test articulated by Judge Learned Hand in the context of a theatrical script:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.

*Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1490 (10th Cir. 1993) (quoting *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930)), *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495, 496 (10th Cir. 2011).

Continued . . .

of the product from the original expression." *Id.* at 1285. Finally, "we compare the

remaining protected elements to the allegedly copied work to determine if the two works

are substantially similar." *Id.* The district court did not err for two reasons.

First, to the extent the court even applied the AFC test,[10] it did so only after

concluding Savant had failed to carry its summary judgment burden by failing to show

that any of the nine elements was protectable. The court's use of the AFC test to

independently analyze the protectability of those elements was therefore unnecessary. It

was Savant's burden, not the court's, to identify what content was protectable under

copyright law.

Second, we reject Savant's contention that our decision in *Blehm* recognized the

AFC test is categorically inapplicable to architectural works by "specifically affirm[ing]"

the D.C. Circuit's approach to analyzing the substantial similarity of architectural works

in *Sturdza*. Aplt. Br. at 18. *Sturdza* emphasized that the "substantial similarity

determination requires comparison not only of the two works' individual elements in

---

The abstraction step involves a more detailed series of steps when applied to computer programs. Specifically, we examine "six levels of generally declining abstraction: (i) the main purpose, (ii) the program structure or architecture, (iii) modules, (iv) algorithms and data structures, (v) source code, and (vi) object code." *Gates Rubber*, 9 F.3d at 835. The district court did not apply this more detailed form of the abstraction step unique to computer programs; its applicability to architectural works is therefore not at issue here.

[10] The district court's ostensible application of the AFC test involved no more than what every substantial similarity analysis must entail: identifying a work's protectable elements and determining whether there is substantial similarity between the accused work and those elements.

isolation, but also of their overall look and feel." 281 F.3d at 1296 (quotations omitted). Savant suggests that by focusing on discrete elements, the AFC test ignores the "overall look and feel" of an architectural work and therefore contradicts *Blehm* and *Sturdza*. We disagree for three reasons.

First, *Blehm* in no way suggested that the AFC test is categorically inapplicable to architectural works. On the contrary, it explained that the test shares the goal of the general substantial similarity analysis applied to any work: "separating unprotectable ideas from protectable expression in [the] copyrighted works and comparing the remaining protectable expression to the [allegedly infringing] images to determine whether they are substantially similar." *Blehm*, 702 F.3d at 1201 n.4. For this reason, we have used the test to analyze content as diverse as computer programs, *see Gates Rubber*, 9 F.3d at 834-46 and wooden dolls, *see Country Kids*, 77 F.3d at 1284-87.

Second, *Blehm* did not affirm *Sturdza*; it only referred to *Sturdza* as an illustration of the idea/expression dichotomy, *Blehm*, 702 F.3d at 1201-02, and *Blehm* was not an architectural work case.

Third, even if we accepted *Sturdza's* emphasis on the "overall look and feel" of a work, that in no way suggests the categorical inapplicability of the AFC test to architectural works. 281 F.3d at 1296. *Sturdza* emphasized the "overall look and feel" of a work as following two general principles of substantial similarity: (1) that the substantial similarity analysis must focus on "the overall similarities rather than the minute differences between the two works," 281 F.3d at 1296 (quoting *Country Kids*, 77 F.3d at 1288), and (2) that "protectible expression may arise through the ways in which

artists combine even unprotectible elements," *id.* Savant suggests the AFC test is at odds

with the second principle because its element-by-element approach precludes examining

original arrangements of individual elements. *See, e.g.*, Aplt. Br. at 3-4. We disagree.

The abstraction step requires a court to examine a work at broad levels of generality—

levels that may involve protectable arrangements of individual elements, as opposed to

discrete elements themselves. *See Country Kids*, 77 F.3d at 1286.[11]

The district court therefore did not err in its application of the AFC test.

### ii. The District Court's Treatment of the Expert Opinions

Savant contends the district court committed two reversible errors in its treatment

of the expert reports. Both contentions fail.

First, Savant argues the district court improperly adopted a legal conclusion from

Mr. Fisher's report. Savant failed to object to the Fisher report on this ground in its

opposition to summary judgment. It therefore forfeited this argument. *Richison v. Ernest*

*Grp.*, 634 F.3d 1123, 1128 (10th Cir. 2011) ("[I]f [a] theory simply wasn't raised before

the district court, we usually hold it forfeited."). Savant has failed to argue plain error,

which "surely marks the end of the road for [its] argument for reversal not first presented

to the district court." *Id.* at 1131.

---

[11] Savant additionally appears to suggest that, even if the AFC test does not preclude a court from analyzing an arrangement of individual elements in an architectural work case, the district court failed to conduct any such analysis in applying the test to these facts. We reject this argument. The absence of this analysis in the district court's opinion is due to Savant's own failure to identify even one selection or arrangement of individual elements as protectable.

Second, Savant argues the district court erroneously excluded Mr. Larson's report sua sponte without first analyzing whether it was admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Savant's argument is meritless. The district court clearly considered Mr. Larson's report and concluded it offered no evidence of the protectability of any element or arrangement of elements.

### C. *Contributory Copyright Infringement and Civil Conspiracy Claims*

The district court also granted Defendants summary judgment on the contributory copyright infringement and civil conspiracy claims because they were derivative of Savant's failed copyright infringement claim. We affirm.

Contributory copyright infringement is derivative of direct copyright infringement. It occurs "when the defendant causes or materially contributes to another's infringing activities and knows of the infringement." *Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013). Thus, "'[t]here can be no contributory infringement without a direct infringement.'" *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1181 (10th Cir. 2009) (quoting *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 889 (6th Cir. 2004)). Savant has failed to show direct copyright infringement for the reasons explained above. As a result, its contributory infringement claim also fails.

Savant's civil conspiracy claim also turns on Savant's copyright infringement claim. "To establish a civil conspiracy in Colorado, a plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate

result." *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995); *accord Scott v. Hern*, 216 F.3d 897, 918 (10th Cir. 2000). Savant alleged that the unlawful act underlying the civil conspiracy was copyright infringement. The failure of the copyright infringement claim therefore defeats the civil conspiracy claim.

For these reasons, we affirm the district court's grant of summary judgment as to the contributory copyright infringement and civil conspiracy claims.

### D. *Trade Dress Infringement Claim*

We also affirm the district court's grant of summary judgment on the trade dress infringement claim. It concluded that Savant offered insufficient evidence of inherent distinctiveness or secondary meaning—an essential element of trade dress infringement.

### 1. **Legal Background**

A trade dress is an object's "total image and overall appearance," and "may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n.1 (1992) (quotations omitted); *see Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). The features of a building may constitute a trade dress. *See Two Pesos*, 505 U.S. at 765 (discussing an alleged trade dress consisting of the interior and exterior features of a restaurant).

"[T]he protection of trademarks and trade dress . . . serves the same statutory purpose of preventing deception and unfair competition." *Two Pesos*, 505 U.S. at 773. More specifically,

[p]rotection of trade dress, no less than of trademarks, serves the [Lanham] Act's purpose to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation."

*Id.* at 774 (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985)).[12]

A party may register a trade dress with the United States Patent and Trademark Office under § 2 of the Lanham Act, 15 U.S.C. § 1052. *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209-10 (2000). But the failure to register a trade dress does not preclude its protectability. Under § 43(a) of the Lanham Act, 15 U.S.C. § 1125, a plaintiff may obtain relief for the infringement of an unregistered trade dress. *See Two*

---

[12] As the Seventh Circuit has similarly explained in a trademark case:

The purpose [of trademark law] is to reduce the cost of information to consumers by making it easy for them to identify the products or producers with which they have had either good experiences, so that they want to keep buying the product (or buying from the producer), or bad experiences, so that they want to avoid the product or the producer in the future. This purpose is achieved by letting a producer pick an identifying name or symbol for his brand, and forbidding competing producers to use the same or a confusingly similar name or symbol on their brands.

*W.T. Rogers Co. v. Keene*, 778 F.2d 334, 338-39 (7th Cir. 1985); *see also Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 338 (7th Cir. 1998) ("Trade dress . . . serves the same function as trademark, and is treated the same way by the Lanham Act and the cases interpreting it."); 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:1 (4th ed. 2015) ("Today, unregistered trade dress is protected under federal Lanham Act § 43(a) under the same rules as are trademarks. Thus, the history of American law throughout much of the 20th century is the gradual disappearance of distinctions between the law of 'trade dress' and that of 'trademarks.'").

*Pesos*, 505 U.S. at 767. Savant alleged its trade dress is unregistered and brought suit under § 43(a).

To obtain relief under § 43(a), a plaintiff must show: "(1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional." *Gen. Motors*, 500 F.3d at 1227.

Savant failed to satisfy the first requirement, which required it to show "either (a) that [the] trade dress features (or feature) are inherently distinctive because their intrinsic nature is such as to almost automatically tell a customer that they refer to a brand, or (b) that the trade dress has become distinctive through acquisition of secondary meaning, so that its primary significance in the minds of potential consumers is no longer as an indicator of something about the product itself but as an indicator of its source or brand." *Vornado Air Circulation Sys., Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir. 1995) (quotations omitted).

a. *Inherent Distinctiveness*

A trade dress is inherently distinctive if its "'intrinsic nature serves to identify a particular source.'" *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002) (quoting *Two Pesos*, 505 U.S. at 768). Trade dress, like trademarks, are classified in the following categories of generally increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Two Pesos*, 505 U.S. at 768, 773 (explaining that this five-category spectrum of distinctiveness, which originated in trademark law, is equally applicable to trade dress law); *Sally Beauty*, 304 F.3d at 977.

A generic trade dress or trademark "refe[rs] to the genus of which the particular product is a species." *Two Pesos*, 505 U.S. at 768 (quotations omitted). Because a generic trade dress or trademark can never be source-identifying, it receives no protection. *Id.* at 768.

A descriptive trade dress or trademark "identifies a characteristic or quality of an article or service, . . . as, for example, its color, odor, function, dimensions, or ingredients." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 939 (10th Cir. 1983) (quotations omitted). It is not inherently source-identifying and therefore receives no protection, unless it "acquire[s] distinctiveness" over time, or develops secondary meaning, which we explain below. *Two Pesos*, 505 U.S. at 769.

A suggestive trade dress or trademark "subtly connote[s] something about the product[]." *Beer Nuts*, 711 F.2d at 939 n.5 (quotations omitted). Finally, a trade dress or trademark that is fanciful or arbitrary bears "no relationship to the product[s] or service[s] with which [it is] associated." *Id.* (quotations omitted). Of these five categories, only suggestive, fanciful, or arbitrary trade dresses or trademarks are inherently distinctive. *Two Pesos*, 505 U.S. at 768.

b. *Secondary Meaning*

To acquire secondary meaning, a trade dress "must have been used so long and so exclusively by one producer with reference to his goods or articles that, in the trade and to that branch of the purchasing public, the [trade dress] has come to mean that the article is his product." *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1154 (10th Cir. 2013) (quotations omitted). Put differently, secondary meaning exists when "in the consumer's

mind the [trade dress] denotes a single thing coming from a single source." *Sally Beauty*, 304 F.3d at 978 (quotations omitted).

Secondary meaning may be shown by "direct evidence, such as consumer surveys or testimony from consumers." *Water Pik*, 726 F.3d at 1154 (quotations omitted). Circumstantial evidence may also be used, such as (1) the length and manner of the trade dress's use, *id.*; (2) the nature and extent of advertising and promotion of the trade dress, *id.*; (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade dress and a particular product or venture, *id.*; (4) actual consumer confusion, *see Vail Assocs., Inc. v. Vend-Tel-Co.*, 516 F.3d 853, 866-67 (10th Cir. 2008);[13] (5) proof of intentional copying, *see Sally Beauty*, 304 F.3d at 978; or (6) evidence of sales volume, *see id.* Sales volume, however, only suggests secondary meaning "when presented in conjunction with other evidence;" "[s]tanding alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification." *Id.*

2. **Analysis**

The district court granted Defendants summary judgment on two grounds: (1) Savant failed to offer evidence of inherent distinctiveness or secondary meaning and

---

[13] *See also* 2 McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:11 (4th ed. 2015) ("If buyers are confused between two sources, then this also means that they must have recognized plaintiff's designation as a trademark and associated it only with plaintiff.").

(2) no reasonable jury could find a likelihood of confusion. We agree as to the first ground and therefore need not address the second.

Savant asserted in district court that it proved both inherent distinctiveness and secondary meaning with evidence of actual consumer confusion, citing Mr. Strope's deposition testimony that at least one potential consumer and a realtor were confused as to whether Savant had built one of the accused houses. Savant abandons this argument on appeal, so we do not consider it. *United States v. Yelloweagle*, 643 F.3d 1275, 1280 (10th Cir. 2011) ("Under [Federal Rule of Appellate Procedure 28], where a defendant raises an issue before the district court but does not pursue it on appeal, we ordinarily consider the issue waived.").

a. *Inherent Distinctiveness*

In moving for summary judgment, Defendants asserted Savant offered no evidence of inherent distinctiveness. They also cited Mr. Fisher's opinion that the Anders Plan consisted of standard elements and standard arrangements of elements, precluding a finding of inherent distinctiveness.

In response, Savant asserted and continues to assert on appeal that its trade dress was inherently distinctive based on the nine elements it alleges are original or unique. Merely reciting these nine elements does not create a genuine dispute of fact as to inherent distinctiveness. Savant has not offered arguments or facts indicating that these nine elements are original or unique so as to make the alleged trade dress inherently source-identifying (meaning suggestive, arbitrary, or fanciful). *See Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1382 (10th Cir. 1994) ("Conclusory statements are insufficient to

defeat a motion for summary judgment."). It has also failed to dispute Mr. Fisher's report indicating the Anders Plan consisted of standard content, which precludes a finding of inherent distinctiveness.

b. *Secondary Meaning*

Savant also failed to raise a fact issue as to secondary meaning. Savant suggested in district court that its sales volume was probative of secondary meaning, citing its sale of six Anders Plan homes. On appeal, it continues to cite this evidence of sales volume and adds that proof of intentional copying also indicates secondary meaning.

We decline to consider Savant's argument that proof of intentional copying suggests secondary meaning. Although we review a grant of summary judgment de novo, "we conduct that review from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." *Adler*, 144 F.3d at 671. Moreover, we do not consider arguments made for the first time on appeal where the party asserting the argument has failed to argue plain error. *Richison*, 634 F.3d at 1131 ("[T]he failure to argue for plain error and its application on appeal . . . marks the end of the road for an argument for reversal not first presented to the district court.").

Savant's evidence of sales volume is therefore the only evidence of secondary meaning properly before this court. "Standing alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification." *Sally Beauty*, 304 F.3d at 978. Savant therefore has failed to create a fact issue as to secondary meaning.

\*   \*   \*   \*

Because Savant failed to raise a fact issue as to inherent distinctiveness or secondary meaning, it failed to satisfy its summary judgment burden on its trade dress claim.  *See Bausman*, 252 F.3d at 1115 ("[T]he nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case.").

## III.  **CONCLUSION**

For the foregoing reasons, we affirm the district court's grant of summary judgment.