**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RICHARD DUTCHER,

    Plaintiff - Appellant,

v.

BOLD FILMS LP; BOLD FILM
PRODUCTIONS, LLC; OPEN ROAD
FILMS, LLC; NBC UNIVERSAL
MEDIA, LLC; UNIVERSAL STUDIOS
HOME ENTERTAINMENT LLC,

    Defendants - Appellees.

No. 19-4126
(D.C. No. 2:15-CV-00110-DB)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

Plaintiff Richard Dutcher appeals from the order of the United States District

Court for the District of Utah granting summary judgment in favor of Defendants on his

copyright-infringement claim. Exercising jurisdiction under 28 U.S.C. § 1291, we

affirm.

Mr. Dutcher holds the copyright in his 2007 film *Falling*. A sketch of the film

will be helpful. The principal characters are Eric and his wife Davey, who have moved to

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of
the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive
value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Los Angeles to pursue their dreams of becoming a screenwriter and an actress. To make ends meet while awaiting success, Eric works as a stringer—a freelance news videographer who sells video footage or photographs to news organizations that then incorporate the materials into their news stories. He works through a middleman named Hector, who sells the footage to media outlets.

The film follows the couple over a four-day period. When Eric attends the funeral of Luis, another stringer, his widow urges Eric to stop stringing because of the danger of the work. He does not follow her advice. He receives a call from Hector and leaves the funeral to film graphic images of the victims of a multivehicle accident, and later that night he films victims of a fire. The next day he is visibly shaken after filming the body of a suicide jumper who landed on the Hollywood Walk of Fame. Later, he meets with a Hollywood producer, who tells him that he needs to push the envelope to succeed as a screenplay writer. After Eric calls Davey to tell her about his disappointing meeting, he witnesses a confrontation between three gang members and another man. He films while the gang members violently stab and kill the man. Eric struggles with his decision to film rather than help the victim. Hector pays him $20,000 for the video.

During the same day, Davey returns home from an acting class and takes a pregnancy test. She discovers to her disappointment that she is pregnant. She attends an audition, where she is asked to pose naked. She is distraught about having to do that but then kisses the casting director after he tells her she landed the part. Davey and Eric meet with friends at a restaurant to celebrate her new role and his sale of the murder video. After viewing the news broadcast of the murder, the group debates whether Eric acted

2

properly in not intervening. At home, Eric's internal turmoil deepens as he thinks about how far he has strayed from his faith. He spends the next day taking Luis's son to the Los Angeles LDS Temple. After the outing, he finds Davey's pregnancy test in the trash. He is initially elated, but then Davey reveals that she terminated the pregnancy that morning and he may not have been the father. He nearly chokes her to death before he storms out of the house.

In the meantime the gang members try to find the source of the murder video. They track down the reporter for the broadcast, who tells them she obtained the video from Hector. When Eric goes to Hector's office to return a gun that Hector had given him, he finds Hector's body and realizes he is next in line. He hurries home but is too late. Davey's corpse is already hanging from the ceiling. Eric contemplates suicide but instead throws his filming equipment in a dumpster, where the gang members ambush him. He manages to kill all three but is fatally wounded. As he dies on the street, he envisions himself at the Los Angeles Temple pleading to Christ for assistance.

Mr. Dutcher brought suit against Defendants Bold Films LP; Bold Films Productions, LLC; Open Road Films, LLC; NBC Universal Media, LLC; and Universal Studios Home Entertainment LLC, contending that their 2014 film *Nightcrawler* infringed on his copyright. The film also involves a stringer in Los Angeles. The movie's principal character, who is named Lou, lives and works in Los Angeles. Unlike Eric, Lou never considers the morality of his decisions. He first appears as a petty thief who sees a stringer filming an accident and decides to pursue that profession. He steals a bicycle and pawns it in exchange for a camcorder and a police scanner. Nina, a news

producer at a local TV station, reviews some of his footage and tells him he has potential. Dedicating himself to stringing, he memorizes police codes and starts wearing more professional clothing. He hires an intern named Rick, who gives him traffic directions as the two drive around Los Angeles for stringing opportunities. Lou obtains valuable up-close footage that is unavailable to rule-abiding stringers. He even begins to tamper with crime and accident scenes to obtain better shots. For example, he goes so far as to drag a body close to a wrecked vehicle for the visual effect. He also tampers with the vehicle of a competing stringer (perhaps cutting the brake lines), causing an accident that he then films. As Lou achieves success, he buys a new car and video equipment. His increasingly valuable work leads to more pay and credit during news broadcasts.

One night, Lou and Rick hear a police dispatch report about a nearby home invasion and are able to arrive at the scene before the police. Lou films the home invaders and their vehicles as they flee. He enters the home and films two dead victims and a man dying in a pool of his own blood. He edits out the portion of the film showing the killers and sells the footage for a hefty sum. He tells the police he has no film of the killers. Lou later identifies the driver of the killers' vehicle, goes to the driver's home with Rick, and then follows the driver and a man he picks up as they go to a restaurant. Waiting outside the restaurant, he calls 911 to report the location of the two killers. This leads to a shootout with the police and a high-speed chase, which ends in a crash. Lou, knowing that the driver is still alive, tells Rick that the driver is dead and instructs him to film the body. The driver fatally shoots Rick and is then killed by the police, as Lou

4

films the episode. Lou immediately takes the footage to Nina, who is captivated. The film ends with the expansion of Lou's business, complete with new interns and vans.

Under the Copyright Act, "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). A copyright-infringement plaintiff must establish both "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Blehm v. Jacobs*, 702 F.3d 1193, 1199 (10th Cir. 2012) (internal quotation marks omitted). Defendants do not dispute that Mr. Dutcher has a valid copyright, so only the copying prong is at issue.

The copying prong has two components. First, there must be copying as a factual matter—that is, the defendant must actually appropriate the plaintiff's work. *See id.* Independent creation of a similar work does not constitute infringement. *Cf. Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 833 n.8 (10th Cir. 1993).

Second, there must be "substantial similarity between the allegedly infringing work and the elements of the copyrighted work that are legally protected [by the Copyright Act]." *Blehm*, 702 F.3d at 1199 (internal quotation marks omitted). "To decide the substantial similarity issue, a court must determine (1) which elements of the copyrighted work are protectable, and (2) whether these elements are substantially similar to the accused work." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1138 (10th Cir. 2016). Because we can decide this appeal on the lack of substantial similarity, we do not

5

address Defendants' argument that the judgment can be affirmed on the ground that there was no actual copying.

The district court awarded Defendants summary judgment. Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We review a grant of summary judgment de novo." *Savant Homes*, 809 F.3d at 1137.

The district court held that no reasonable jury could conclude that the two films are "substantially similar." This holding may seem inevitable, given the obvious differences in the plots of the two films, unless one is inclined to equate, for example, a stringer's search for the murderers with the murderers' search for the stringer. In any event, the district court supported its ruling with an analysis and application of the pertinent copyright law. We see no need to repeat that analysis, which was more than adequate to the task. We do, however, respond to Mr. Dutcher's appellate arguments that were not addressed by the district court.

First, Mr. Dutcher contends that deciding the case on summary judgment improperly removes the substantial-similarity determination from the jury. Our cases, however, have affirmed that in proper circumstances a court may enter summary judgment on substantial-similarity grounds. *See, e.g.*, *id.* at 1143; *Blehm*, 702 F.3d at 1199.

Second, Mr. Dutcher argues that the district court erred by applying the abstraction-filtration-comparison (AFC) test in its substantial-similarity analysis. The AFC test has three steps: (1) separation of abstract ideas (which are not protected under

6

the Copyright Act) from the particular expression of those ideas in the work, (2) filtering out the unprotectable components from protectable expression, and (3) comparison of the remaining protectable elements with the accused work. *See Savant Homes*, 809 F.3d at 1144. Contrary to Mr. Dutcher's argument, we have held that this is a legitimate test for determining substantial similarity. *See id.* at 1144 n.10 ("The district court's ostensible application of the AFC test involved no more than what every substantial similarity analysis must entail: identifying a work's protectable elements and determining whether there is substantial similarity between the accused work and those elements.").

Third, Mr. Dutcher contends that the district court erred in applying the scenes a faire doctrine because there is no established genre of stringer films. He misconceives the doctrine. "Under the *scenes a faire* doctrine, we deny protection to those expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting." *Gates Rubber*, 9 F.3d at 838. We discern no requirement that there actually be a genre of films for the doctrine to be applicable.

Finally, Mr. Dutcher objects to the failure of the district court to order disclosure of the compensation for one of Defendants' expert witnesses. But the issue was mooted by the district court's decision, which did not rely on any expert testimony in concluding that *Falling* and *Nightcrawler* are not substantially similar. In fact, Mr. Dutcher himself contends that the issue should be addressed only if this case is remanded to the district court. We therefore need not address it.

7

We **AFFIRM** the district court's summary judgment.

Entered for the Court


Harris L Hartz
Circuit Judge
